Case No. 13-21350-CIV-GRAHAM/SIMONTON

ANDRES GREGORY, et al.,

    Plaintiffs,

vs.

MIAMI-DADE COUNTY, et al.,

    Defendants.

_____/

## AMENDED ORDER

**THIS CAUSE** comes before the Court upon Defendant Luis Perez's Motion for Summary Judgment [D.E. 153] and Plaintiffs' Motion for Reconsideration of Order Granting Defendant's Motion for Summary Judgment Regarding Counts V and VIII [D.E. 193].

**THE COURT** has considered the Motions, the Responses and Replies thereto, pertinent portions of the record, conducted an evidentiary hearing, and is otherwise fully advised in the premises. On July 21, 2015, the Court granted Plaintiffs' Motion for Reconsideration and, pursuant to Rule 56(f), Federal Rules of Civil Procedure, allowed the parties to submit additional briefs and record evidence pertaining to Counts V and VIII of the Third Amended Complaint. [D.E. 194]. Upon reconsideration and for the reasons stated herein, Defendant Luis Perez's Motion is **GRANTED IN PART** and **DENIED IN PART**.

# I. FACTUAL & PROCEDURAL BACKGROUND

Sebastian Gregory ("Sebastian") and his parents, Andres Gregory and Amalia Villafane-Gregory (collectively referred to as "Plaintiffs"), brought this action against Miami-Dade County ("County") and Officer Luis Perez ("Officer Perez") (collectively referred to as "Defendants") alleging, _inter alia_, a violation of Sebastian's Fourth Amendment rights pursuant to 42 U.S.C. § 1983, battery, intentional infliction of emotional distress, false imprisonment, and loss of filial consortium. [D.E. 60]. Plaintiffs are seeking monetary damages in excess of $15,000.00, exclusive of interest and court costs. _Id._ The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

The undisputed facts giving rise to this action are as follows. At approximately 3:30 a.m. on May 28, 2012, Sebastian, a 16 year old boy at the time, was walking westbound on the south side of Southwest 72nd Street, Miami-Dade County, when Officer Perez, driving his police cruiser eastbound on Southwest 72nd Street, observed him. "It was a typical late May night for Miami: hot and humid." [D.E. 154 at 3, ¶ 23; 161 at 2]. At the time, Sebastian was wearing "a baggy sweater on top of a purple tee shirt, black pants, a black scully cap or beanie covering his head, and black shoes." [D.E. 154 at 3, ¶ 24; 161 at 2]. In addition, Sebastian was carrying "a metallic bat, an Ipod with headphones, a cell phone and [a] white trash bag." _Id._ at ¶ 26; D.E. 161 at 2.

The "metallic bat was in his top right pants pocket, with the barrel of the bat inserted all the way into the pocket." Id. at ¶ 27; [D.E. 161 at 2]. The bat is 25" long and "[w]hen fully inserted in to the right front pocket, approximately 7-8" of the bat are covered, leaving 17-18" uncovered, 9-10" of which is the shiny transition portion of the bat." Id. at 6, ¶¶ 67-68; [D.E. 161 at 7].

Based on his observations, "Officer Perez passed [Sebastian] and made a U-turn." Id. at ¶ 32; [D.E. 161 at 3]. However, Sebastian "did not see Officer Perez drive past him." Id. at ¶ 33; [D.E. 161 at 3]. Thereafter, Officer Perez "drove his marked vehicle behind [Sebastian] and attempted to effectuate a stop." Id. at ¶ 35. Since Sebastian did not react to the police cruiser pulling up behind him, Officer Perez "activated his blue and red emergency lights and his spotlight." Id. at ¶¶ 36-37. Sebastian continued to walk "as Officer Perez exited his vehicle and [kept] walking for a least several seconds after the police cruiser door slammed shut." Id. at 5, ¶ 44. Officer Perez then "advanced towards [Sebastian] with his weapon drawn." Id. at ¶ 45. Although he did not know what was said, Sebastian "heard Officer Perez's voice . . ., stopped, and turned around." Id. at ¶ 47. "However, [Sebastian] did not turn fully around but instead [only turned his] head an looked back at Officer Perez for approximately 5-6 seconds." Notably, "during this 5-6 second period, Officer Perez recognized

[Sebastian] as the individual whom he arrested the previous month."
Id. at ¶49.[1]

After recognizing him, Officer Perez "commanded [Sebastian] to assume a prone position on the ground." Id. at ¶ 51. Sebastian then proceeded to the ground. "At this point, Officer Perez was approximately 7 feet away from [Sebastian]" with his "firearm still trained on [him]." Id. at ¶¶ 53, 55. Given his prior observations and Sebastian's movements in the following moments, "Officer Perez believed that [Sebastian] was reaching for a gun" and "discharged his firearm." Id. at 6, ¶¶ 59, 62. "At no point prior to Officer Perez discharging his firearm did [Sebastian] make any statements indicating his intention to comply with Officer Perez's commands or advising Officer Perez that he was about to make a movement." Id. at ¶ 63. The metallic bat remained in Sebastian's right front pocket at the time he was shot and was later recovered by Officer David Zbik. Id. at ¶¶ 66, 79.

---

[1] Similar to the facts giving rise to this action, Officer Perez encountered Sebastian around 3:00 a.m. on April 10, 2012 while on routine patrol. [D.E. 154 at 1, ¶ 1]. Officer Perez noticed Sebastian was wearing all dark clothing in the roadway between 156th Court and S.W. 82nd Street. Id. While approaching Sebastian, Officer Perez noticed a bulge on Sebastian's "right hip below the waistline and decided to conduct a Terry stop." Id. at ¶ 2. After conducting a frisk for weapons, Officer Perez found Sebastian to be "in possession of three concealed weapons: a metallic T-ball bat and two knives." Id. at ¶ 3. Thereafter, Officer Perez arrested Sebastian and "placed him into the back of his police car and conducted a routine records check." Id. at 2, ¶ 3. Officer Perez's records check revealed that Sebastian "had an open warrant for failing to appear in court on a prior concealed weapons charge that has been issued the previous day." Id. at ¶ 5. In addition, Officer Perez noticed Sebastian's criminal history, which included "offenses that related to burglary, aggravated battery, concealed weapons charges and possession of a weapon on school property." Id. at ¶ 6.

In their Third Amended Complaint, Plaintiffs maintain Officer Perez was not justified in utilizing deadly force against Sebastian and also note that Sebastian was "never arrested for nor charged with any crime relating to this incident." Id. at ¶¶ 12-13. In response, the County successfully challenged Plaintiffs' claims pled against it by moving to dismiss on the basis of sovereign immunity. [D.E. 63]. As a result, the Court dismissed the County from this action on February 13, 2015 and allowed the case to proceed against Officer Perez. [D.E. 112]. After engaging in lengthy discovery, Officer Perez now moves for summary judgment on Plaintiffs' remaining claims against him. The Court will address the merits of his Motion below.

## II. STANDARD OF REVIEW

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). That burden is discharged if the moving party shows the Court that there is "an absence of evidence to support the non-moving party's case." Id. at 325. Once the moving party discharges its burden, the non-moving party must designate specific facts showing that there is a genuine

issue of material fact. Id. at 324. Issues of fact are "genuine" if a reasonable fact finder considering the evidence presented could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Furthermore, the Court is not permitted to weigh the credibility of the parties on summary judgment. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1531 (11th Cir. 1987). If the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact. Id.; see also McCormick v. Ft. Lauderdale, 333 F.3d 1234, 1240 (11th Cir. 2003) ("Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment."); Moorman v. UnumProvident Corp., 464 F.3d 1260, 1267 n.1 (11th Cir. 2006)("Credibility determinations at summary judgment stage are impermissible."). The Court, therefore, reviews the Motion applying the foregoing principles of law.

## III. DISCUSSION

In his Motion, Officer Perez argues that he is entitled to summary judgment on the following grounds: (1) he had objectively reasonable suspicion to stop Sebastian and probable cause to arrest him; (2) he is entitled to qualified immunity because he had an objectively reasonable basis to use deadly force and no clearly established law forbade the use of deadly force under the

circumstances; and (3) he is entitled to sovereign and self-defense immunity under Florida law. [D.E. 153]. Naturally, Plaintiffs take the opposite view and argue that, "[n]ot only does this case present material issues of disputed fact that demand resolution by a jury, but the facts are clear that [Officer Perez] has no legitimate justification to stop, much less shoot, [Sebastian]." Plaintiffs further maintain that "this case presents facts evidencing a purposeful exercise of decision-making by [Officer Perez] that led directly to the unreasonable, unconstitutional, but avoidable shooting of [Sebastian]" and that he "is not entitled to summary judgment in his favor on any of the grounds asserted." [D.E. 160].

### A. Qualified Immunity

If applicable, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002)(quoting Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001))(internal quotation marks omitted). "In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. at 1194 (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991))(internal quotation

7

marks omitted). On the other hand, "[i]f the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity." Id. Further, when a "defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. ; see also Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996)("Once the qualified immunity defense is raised, plaintiffs bear the burden of showing that the federal rights allegedly violated were clearly established.").

The Supreme Court mandated a two-step analysis for resolving qualified immunity claims in Saucier v. Katz, 533 U.S. 194 (2001). Pursuant to Saucier, "a court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was 'clearly established' at the time of the defendant's alleged misconduct." Id. at 201.[2] In addition, "Plaintiffs cannot carry their burden of proving the law to be clearly established by stating constitutional rights in general terms." Holston, 94 F.3d at 1532 (citing Dartland v. Metro. Dade Cnty., 866 F.2d 1321, 1323 (11th Cir. 1989). Indeed, Plaintiffs' burden against qualified

---

[2] In reconsidering the analysis required in Saucier, the Supreme Court concluded that, "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223, 225, 236 (2009). The Court went on to say, "[t]he judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." Id. at 236.

immunity is a heavy one because "[t]he protection . . . applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Callahan, 555 U.S. at 231 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)(Kennedy, J., dissenting)).

Here, it is undisputed that Officer Perez was acting within his discretionary authority throughout his encounter with Sebastian. In their Third Amended Complaint, Plaintiffs specifically allege that "Officer Perez was employed by the County as a police officer, and was, at all times described herein, acting within the course and scope of his official duties." [D.E. 60 at 2, ¶ 6]. Likewise, in his Answer, Officer Perez "admits that he was employed by Miami-Dade County as a police officers and acted within the course and scope of his official duties at all times relevant to this lawsuit." [D.E. 64 at ¶ 4]. As such, the burden now shifts to Plaintiffs to show Officer Perez is not entitled to qualified immunity. Ferraro, 284 F.3d at 1193-94.

**B. Counts I and VI**

In Counts I and VI, Plaintiffs assert their excessive force and false imprisonment claims on the premise that "Officer Perez did not have the legal authority to . . . detain Sebastian or to deprive [him] of his liberty." [D.E. 60 at 11, ¶ 52]. With respect to excessive force in the context of an illegal stop, Plaintiffs specifically allege that "Officer Perez had no probable cause to

believe that Sebastian committed any crime or was about to commit a crime" and that "Officer Perez had neither reasonable suspicion nor particularized probable cause when he . . . seized Sebastian by using deadly force and restraint, shooting Sebastian multiple times in the back." [D.E. 60 at 4, ¶¶ 15-16].

### 1. Violation of a Constitutional Right

According to the text of the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. In <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court held that it is constitutionally permissible for a police officer to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." <u>U.S. v. Sokolow</u>, 490 U.S. 1, 7 (1989) (citing <u>Terry</u>, 398 U.S. at 30). This type of police encounter is now known in common legal parlance as a <u>Terry</u> stop.

In order for a <u>Terry</u> stop to be permissible, "'[t]he officer . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" <u>Alabama v. White</u>, 496 U.S. 325, 329 (1990)(quoting <u>Sokolow</u>, 490 U.S. at 7). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.

Both factors - quantity and quality - are considered in the 'totality of the circumstances - the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion." Id. at 331 (internal quotation omitted). Thus, "whether reasonable suspicion existed is an objective test, and an officer's subjective intentions or beliefs are immaterial." U.S. v. Robinson, 515 F. App'x 790, 792 (11th Cir. 2013); see also, Graham v. Connor, 490 U.S. 386, 397 (1989). However, "[i]n the context of qualified immunity, . . . 'the issue is not whether reasonable suspicion existed in fact, but whether the official had 'arguable' reasonable suspicion.'" Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)(quoting Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000)).

Here, the record shows Officer Perez had arguable reasonable suspicion based upon articulable facts that Sebastian either committed, was committing, or was about to commit a crime, to wit: carrying a concealed weapon, violation of curfew, and loitering and prowling. In particular, Officer Perez observed Sebastian at approximately 3:00 a.m. on the night in question. It is undisputed that the area where Officer Perez made contact with Sebastian "had been hit with a string of vehicle burglaries over the previous months." [D.E. 154 at 3, ¶ 16]. In his Declaration, Officer Perez stated that, as he initially drove past Sebastian, he "appeared to be that of a young person, likely between the ages of 15 to 17" and

11

that the "particular area, around Sunset Drive between 147th and 162[nd] [A]venues, the majority of the pedestrians whom [Officer Perez] encountered on foot during the midnight shift prior to May 28, 2012 were juveniles under the age of 17." [D.E. 154-13 at 1, ¶¶ 2-3]. In addition, Sebastian's clothing, which consisted of "a baggy sweater on top of a purple tee shirt, black pants, a black scully cap or beanie covering his head, and black shoes," was not typical for a hot and humid late-May night in Miami. [D.E. 154 at 3, ¶¶ 23-24; 161 at 2]. Moreover, during his deposition, Officer Perez testified that, as he approached Sebastian, he "noticed a bulge on [Sebastian's] right hip." [D.E. 154-1 at 68]. Officer Perez went on to explain that: "As my vehicle's headlights shine on that bulge, there was approximately two inches between the bottom of [Sebastian's] sweatshirt and the top of the pants that exposed a metallic object." Id.

Plaintiffs disagree with Officer Perez's statements concerning his observations on the scene and argue Sebastian's testimony about the appearance of his clothing create a genuine issue of material fact. However, the Court finds Plaintiff's arguments to be unavailing and belied by the record. Although Sebastian testified that his "baggy sweater covered the pockets" of his baggy jeans, this testimony does not directly refute Officer Perez's observation of a bulge on Sebastian's right hip. [D.E. 154-2 at 17-18]. Similarly, the second officer to respond to the scene, Officer

David Zbik, testified that he "saw a bulge in [Sebastian's] waistband area that protruded upward. While assessing him, [Sebastian's] shirt moved and there was a silver shiny part in between his shirt and his waistband area." [D.E. 162-1 at 8-9]. In addition, the photographs taken of Sebastian at the scene supports Officers Perez and Zbik's testimony about observing a bulge near the waistband area of Sebastian's right side. [D.E. 154-8 at 1-3].

As to the visibility of the metallic portion of the bat, Plaintiffs again rely on Sebastian's testimony stating that his clothing completely covered the bat and, by virtue of this fact, further assert that Officer Perez could not have seen any exposed metal prior to stopping Sebastian. [D.E. 154-2 at 17-18]. In his deposition, Sebastian testified that the pockets in his pants were deep enough to conceal the entire length of the bat. Id. at 17. However, at the time of the shooting, Sebastian later testified that he could not remember if it was visible or not. Sebastian's exact testimony was as follows:

> Q: Okay. So you don't remember what the bat — whether the bat was visible or not?
> A: Do I know?
> Q: No, I'm asking, you weren't — you weren't looking at it at the time?
> A: I wasn't looking at it. Yeah.
>
>    . . .
>
> Q: Okay. Any you — So you don't remember seeing whether part of the bat was visible?
> A: I don't remember anything. I don't remember where my head was.

[D.E. 154-2 at 25]. Moreover, Sebastian admitted that his initial observations were based on the appearance of his clothing at the time he dressed himself and not at time of the shooting. On this point, Sebastian testified as follows:

> Q: Okay. So - So the grips were coming out of your pocket?
> A: Yeah.
> Q: But they were covered?
> A: Yes.
> Q: Okay. But - but you - you couldn't see that either, right? So how would you know what part is sticking out?
> A: Well, because when I first put my pants on and I put the bat, I sort of saw it. Well, I - I may be wrong, I - I - I may be wrong. I may be wrong. I don't know what to tell you, I may be wrong.

[D.E. 154-2 at 38]. Sebastian's testimony in this regard fails to present a genuine issue of material fact because "a witness'[s] statement that he 'does not recall' information . . . is insufficient to refute record evidence unequivocally establishing the matter." Pellon v. Business Representation Int'l., Inc., 528 F. Supp. 2d 1306, 1311 (S.D. Fla. 2007); see also Valderrama v. Rousseau, 780 F.3d 1108, 1113-15 (11th Cir. 2015); Posey v. Skyline Corp., 702 F.2d 102, 105-06 (7th Cir. 1983).

Furthermore, in her report, Dr. Emma O. Lew, M.D., Deputy Chief Medical Examiner for the Miami-Dade County Medical Examiner Department, concluded that:

> The lower right areas of the T-shirts do not have holes that would correspond with the entrance hole on the baseball bat. Therefore, the shirts were not covering the portion of the bat that was perforated by the projectile. If the shirts were just above the entrance hole on the

14

> baseball bat, approximately two inches of the baseball
> bat would have been visible at the outside edge of the
> right front pocket of the black jeans.

[D.E. 154-7 at 4]. Dr. Lew's conclusion is further supported by the measurements of the bat and Sebastian's clothing. For example, "[w]hen fully inserted in to the right front pocket, approximately 7-8″ of the bat are covered, leaving 17-18″ uncovered, 9-10″ of which is the shiny transition portion of the bat." Id. at 6, ¶¶ 67-68; [D.E. 161 at 7]. As such, the uncontested physical evidence is in direct contrast to Sebastian's testimony and his lack of recollection.

Given the totality of the above-mentioned circumstances, the Court finds Officer Perez had arguable reasonable suspicion to conduct a Terry stop on Sebastian. The time and manner of Sebastian's appearance coupled with the observance of a bulge, metallic reflection, and prior encounter justified Officer Perez's stop for carrying a concealed weapon and for loitering and prowling. See Bourgeois v. Peters, 387 F.3d 1303, 1316 (11th Cir. 2004)("First, if [officers] have 'reasonable suspicion' that anyone is carrying a weapon, they may conduct an ordinary Terry stop."); see also Fla. Stat. §§ 856.021(1) and (2) ("It is unlawful for any person to loiter or prowl in a place, at a time or in a manner not usual for law-abiding individuals, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety or persons or property in the vicinity." Moreover, "[a]mong

the circumstances which may be considered in determining whether such alarm or immediate concern is warranted is the fact that the person . . . manifestly endeavors to conceal . . . any object."). In addition, Officer Perez's experience with curfew violations and Sebastian's youthful appearance also provided him with arguable reasonable suspicion to stop and investigate. See Fla. Stat. § 877.22; see also Miami-Dade County Code §§ 21-203(i), 21-204, and 21-210(b) ("Any juvenile violating the provision of Section 21-204 shall be taken into custody and transported immediately to the police station, substation, or other appropriate holding facility in accordance with Chapter 39, Florida Statues, or to the juvenile's home.").

Furthermore, under Florida law, "False imprisonment . . . is the unlawful restraint of a person against his will, the gist of which is the unlawful detention of the plaintiff and the deprivation of his liberty." Maybin v. Thompson, 606 So. 2d 1240, 1241-42 (Fla. 2d DCA 1992)(citing Johnson v. Weiner, 19 So. 2d 699 (Fla. 1944))[3]. "The existence of probable cause is a defense to false imprisonment." Cutino v. Untch, -- F. Supp. 2d --, 2015 WL 178481, at *8 (S.D. Fla. Jan. 14, 2015). To establish the existence of probable cause, "an arrest must be objectively reasonable based on the totality of the circumstances." Id. at *6 (quoting Ferraro,

---

[3] "False arrest and false imprisonment are different labels for the same cause of action." Weissman v. K-Mart Corp., 396 So. 2d 1164, 1165 n.1 (Fla. 3d DCA 1981).

284 F.3d at 1195). Similarly, to receive qualified immunity, "an officer need only have 'arguable' probable cause for the arrest," which "exists when 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest Plaintiff." Id. (quoting Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990)).

In this case, the same observations that form the basis for Officer Perez's arguable reasonable suspicion to conduct a Terry stop also support the finding of arguable probable cause to believe Sebastian was carrying a concealed weapon. According to Fla. Stat. § 790.01(1), "a person . . . who carries a concealed weapon . . . on or about his or her person commits a misdemeanor of the first degree." Moreover, a concealed weapon is defined as "any dirk, metallic knuckles, slungshot, billie, . . . , or other deadly weapon carried on or about a person in such a manner as to conceal the weapon from ordinary sight of another person." Fla. Stat. § 790.001(3)(a). Based upon his observation of a bulge and metallic reflection on Sebastian's right hip, Officer Perez had arguable probable cause to believe Sebastian was carrying a concealed weapon in violation of Fla. Stat. § 790.01(1), which is necessarily fatal to Plaintiffs' claims of excessive force during an illegal stop and false imprisonment.

## 2. Clearly Established Right

Turning to the second prong of the <u>Saucier</u> analysis, Plaintiffs have not presented nor has the Court found any authority that, based on similar facts, suggests Officer Perez did not have arguable reasonable suspicion to stop Sebastian or arguable probable cause to arrest him for carrying a concealed weapon. Therefore, Officer Perez is entitled to qualified immunity on Counts I and VI and summary judgment in his favor is appropriate as to these counts.

## C. Count II

In Count II, Plaintiffs assert an excessive force claim against Officer Perez in the context of a legal stop. Accordingly, "[t]he first step in reviewing an excessive force claim is to determine whether the plaintiff was subjected to the 'intentional acquisition of physical control' by a government actor - that is, whether there was a "seizure" within the meaning of the Fourth Amendment." <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1328 (11th Cir. 2003)(citing <u>Brower v. County of Inyo</u>, 489 U.S. 593, 596 (1989)). A seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." <u>Id.</u> (emphasis in original). To satisfy this standard, it is enough "that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." <u>Id.</u> at 1329. Moreover, the Supreme Court established that "apprehension by the

use of deadly force is a seizure." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985).

Here, Officer Perez testified that he believed Sebastian was reaching for a gun and discharged his firearm. [D.E. 154-1 at 93-94]. It is also undisputed that, based upon "[t]he medical evidence, including Dr. Cockburn's findings during surgery, Dr. Danton's analysis of the CT scans, [and] the appearance of gunshot wounds on [Sebastian's] back . . ., gunshots entered [Sebastian's] body from the left and from the right." [D.E. 154-7 at 4]. Therefore, the Court finds that Sebastian was subjected to a seizure within the meaning of the Fourth Amendment. <u>Vaughan</u>, 343 F.3d at 1328; <u>Garner</u>, 471 U.S. at 7.

### 1. Violation of a Constitutional Right

Since the Fourth Amendment only guards against unreasonable searches and seizures, it is necessary to look to the "'reasonableness' of a particular use of force" and it "must be judged from the perspective of a reasonable officer on scene, rather than the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 397. Therefore, in qualified immunity cases, the relevant inquiry is

"not whether the suspect intended to surrender, but rather whether a reasonable officer on the scene would think the suspect is surrendering." Harper v. Davis, 571 F. App'x 906, 913 (11th Cir. 2014). Furthermore, it is "constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril," Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005), and when the officer has "probable cause to believe that the suspect posed a direct threat of serious physical harm or death." McCoullough v. Antolini, 559 F.3d 1201, 1208 (11th Cir. 2009).

Additionally, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Case v. Eslinger, 555 F.3d 1317, 1327 (quoting Illinois v. Gates, 462 U.S. 213, 245 n.13 (1983)). In other words, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information'" and "[e]ven 'seemingly innocent activity' can be the basis for probable cause." Id. (internal citation and quotation omitted). Moreover, even if probable cause is lacking, "an officer is still entitled to qualified immunity if arguable probable cause existed." Id. (citing Ferraro, 284 F.3d at 1195. As stated above, "[a]rguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed . . . ." Id. Lastly, "[a]

reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1269 (11th Cir. 2003).

In the moments leading up to the shooting, it is undisputed that Officer Perez "drove his marked vehicle behind [Sebastian] and attempted to effectuate a stop." <u>Id.</u> at ¶ 35. Since Sebastian did not react to the police cruiser pulling up behind him, Officer Perez "activated his blue and red emergency lights and his spotlight." <u>Id.</u> at ¶¶ 36-37. Sebastian continued to walk "as Officer Perez exited his vehicle and [kept] walking for a least several seconds after the police cruiser door slammed shut." <u>Id.</u> at 5, ¶ 44. Officer Perez then "advanced towards [Sebastian] with his weapon drawn." <u>Id.</u> at ¶ 45. Although he did not know what was said, Sebastian "heard Officer Perez's voice . . ., stopped, and turned around." <u>Id.</u> at ¶ 47. "However, [Sebastian] did not turn fully around but instead [only turned his] head and looked back at Officer Perez for approximately 5-6 seconds." <u>Id.</u> at ¶ 48. Notably, "during this 5-6 second period, Officer Perez recognized [Sebastian] as the individual whom he arrested the previous month [for carrying concealed weapons]." <u>Id.</u> at ¶ 49.

After recognizing him, Officer Perez "commanded [Sebastian] to assume a prone position on the ground." <u>Id.</u> at ¶ 51. Sebastian did not immediately comply with Officer Perez's command because he did not hear his exact words. [D.E. 154-2 at 22]. "At this point,

Officer Perez was approximately 7 feet away from [Sebastian]" with his "firearm still trained on [him]." Id. at ¶¶ 53, 55. Sebastian subsequently lowered himself onto the ground. [D.E. 154-2 at 23]. Given his prior observations, facial recognition, and Sebastian's subsequent movements, "Officer Perez believed that [Sebastian] was reaching for a gun" and "discharged his firearm." Id. at 6, ¶¶ 59, 62. Approximately thirty (30) seconds elapsed between Officer Perez exiting his vehicle and discharging his weapon. [D.E. 154-13 at 3]. Furthermore, "[a]t no point prior to Officer Perez discharging his firearm did [Sebastian] make any statements indicating his intention to comply with Officer Perez's commands or advising Officer Perez that he was about to make a movement." Id. at ¶ 63. The metallic bat remained in Sebastian's right front pocket at the time he was shot. Id. at ¶ 66.

Here, Plaintiffs contend a genuine issue of material fact exists as to Officer Perez's belief that Sebastian was reaching for a gun given the record evidence concerning the exact placement of Sebastian's hands and body at the time of the shooting. In his deposition, Sebastian testified to the following events after he assumed a prone position on the ground:

> Q: Right. . . . Your head is not looking at your waist at this point, is it?
> A: I told you I don't remember where my head was, so I can't tell you.
>
> . . .

> Q: So where were your hands a this point?
> A: They were horizontally with my elbows up.
>
>     . . .
>
> Q: Okay. So - So your elbows are out the side?
> A: Yes, sir.
> Q: Okay. And your - and your - the palms of your hands
>     would be at what, at what level of your body, at
>     shoulder level?
>               . . .
> A: Yeah.
> Q: Okay. So your - your arms were bent on both sides?
> A: Yes, sir.
>
>     . . .
>
> Q: Okay. What's the next thing that happens?
> A: I wobbled my leg a little bit because the bat was
>     like bothering me, remember because it's - it's a
>     bat in my pocket covered by my - concealed on my
>     sweater.  I wobbled a little bit and that's when he
>     shot me.

[D.E. 154-2 at 24-25]. Sebastian further states that his body was

parallel to the street and that Officer Perez was completely behind

him. Id. Also, Sebastian testified that, at the time he was shot,

the bat was completely covered by his body such that Officer Perez

could not have seen any exposed metal. [D.E. 154-2 at 36].

In comparison, Officer Perez's testimony concerning the

moments leading up to the shooting was as follows:

> Q: All right. And did he stop walking at any point?
> A: Yes.
> Q: Okay. When he showed you his hands, what did he do?
> A: He put his hands out towards his sides. His elbows
>     were bent, and his hand were not completely
>     stretched out.  They were approximately at shoulder
>     level.
>               . . .

A: As he gets down on the ground, I am approximately
   seven feet away from him. His head is facing south.
   His feet are facing north, and –
Q: So he's perpendicular to the sidewalk?
A: Perpendicular to the sidewalk and myself.

                        .  .  .

A: I am east of him.
Q: So you would be on his left side?
A: On his left side.
Q: Okay. Do you have a clear visual of him?
A: I have a clear visual of him, of the object that I
   believe to be a gun, and of his hands.

                        .  .  .

Q: And are his hands out to the side?
A: Yes.
Q: Okay. So –
A: Not completely stretched out. They're close to his
   body, but at least at that point I could see them.

                        .  .  .

Q: And what happens next?
A: In that instance when I glanced down to my radio,
   [Sebastian] rolls his body towards the right
   towards me.

                        .  .  .

Q: So what happens with his hands?
A: His right hand moves quickly to what I believe was a
   gun.
Q: All right.  And what did you do?
A: When I saw his hand touch what I believed was a gun,
   his right side of his body was facing me. At that
   point, in my mind he was going to shoot me.

[D.E. 154-1 at 84-93]. Thus, Officer Perez's testimony is partially

consistent with Sebastian's version of events, with the exception

of Sebastian's body and hand positions at the exact moment of the

shooting.

24

Turning to the undisputed physical evidence on record, according to the consultation report submitted by Dr. Lew, "bullets entered [Sebastian's] body from both the left and the right side." Id. at ¶ 70; [D.E. 154-7 at 4]. In addition, "one projectile perforated the [metallic] bat." Id. at ¶ 72. "The projectile traveled right to left and upwards across [Sebastian's] right hip and lower abdominal area, which would not have been possible if [Sebastian] were lying on top of the [metallic] bat covering it." Id. at ¶ 74. Moreover, Dr. Lew includes the following observation in her report:

> The pathways [of the bullets] from both the left and the right would not be possible if Officer Perez and [Sebastian] were in the positions as described by [Sebastian] in his deposition, i.e., Officer Perez standing behind [Sebastian] as [Sebastian] is lying prone of the sidewalk with his feet toward Officer Perez and his head away from Officer Perez. . . . The grouping of the casings at the scene support that Officer Perez did not move his location during the shooting. The pathways of the gunshot wounds in [Sebastian's] body are consistent with [Sebastian] being perpendicular to Officer Perez and turning or rolling from side to side as he was shot, allowing projectiles to enter from both the left and the right.

[D.E. 154-7 at 4-5]. Since Dr. Lew's opinion is uncontroverted, the Court finds that Sebastian's testimony regarding his body position stands in direct contrast with the physical evidence on record and, as a result, cannot be accepted to create a genuine issue of material fact. See Scott v. Harris, 550 U.S. 372, 380 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); see also Johnson v. Niehus, 491 F. App'x 945, 950 (11th Cir. 2012); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004); Howard v. Memnon, 572 F. App'x 692, 695 (11th Cir. 2014).

However, a closer question exists regarding Sebastian's hand placement at the moment of the initial shot. As noted above, Officer Perez testified that he "saw [Sebastian's] hand touch what [he] believed was a gun" and "[a]t that point, in [his] mind [Sebastian] was going to shoot [him]." [D.E. 154-1 at 93]. In his Motion, Officer Perez argues that Plaintiffs fail to present "specific sworn testimony rebutting Officer Perez's statement that [Sebastian] reached for the baseball bat *at the time of the shooting*." [D.E. 170 at 5] (emphasis in original). Even so, the Court does not find Officer Perez's argument accurately summarizes the record.

For example, late in his deposition, Sebastian testified as follows:

> Q: Okay. And when - and when you were - when you were on the ground, do you have any recollection as to how long [Officer Perez] was firing at you for? How long did the shots take?
> A: No, I have no - no.
> Q: Okay. Was it - was it rapid - was it rapid fire?
> A: I don't know. I don't know.
>
>                          . . .

Q: Did [Officer Perez] ever say "Put your hands out" —
A: *My hands were already out.*
Q: Okay. Did he ever say "Put your hands down"?
A: No.

[D.E. 154-2 at 28](emphasis added). Moreover, during the evidentiary hearing held by the Court on June 25, 2015, Sebastian further clarified his deposition testimony during the following exchange:

Q: All right. At any time prior to you[] moving your leg, did you move either of your hands in a downward direction towards your lower body, sir?
A: No.
Q: At any time prior to the point you were shot, did your hands leave the position that you've testified up — I would say were they around you head level, sir?
A: Yeah.
Q: Did at any point prior to the actual shots being fired did you move your hands down towards you lower body?
A: No. I never moved my hands out toward my lower body.

[D.E. 191 at 19].

Viewing all of Sebastian's testimony in a light most favorable to Plaintiffs, a reasonable jury could find that Sebastian did not move his hands towards the metal bat at the moment of the shooting. See Johnson, 491 F. App'x at 950 ("[A] judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented")(quoting Anderson, 477 U.S. at 252). Thus, a genuine issue of material fact exists as to the exact placement of Sebastian's hands at the time Officer Perez fired the initial shot. Understanding that "police officers are often forced

to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation," if a jury finds Sebastian did not move his hands, it would not have been reasonable for Officer Perez to believe his life was in peril simply by Sebastian "wobbling" his right leg or rolling onto his left side. Graham, 490 U.S. at 397; see also Robinson, 415 F.3d at 1256; McCoullough, 559 F.3d at 1208; Harper, 571 F. App'x at 913 (The relevant inquiry is "not whether the suspect intended to surrender, but rather whether a reasonable officer on the scene would think the suspect is surrendering.").

### 2. "Clearly Established" Right

Even if Officer Perez did not have arguable probable cause to believe Sebastian posed a threat to his life and, consequently, violated Sebastian's Fourth Amendment right against an unreasonable seizure, the Court must nonetheless consider the second prong of the Saucier analysis. Officer Perez may still be clothed with qualified immunity if Sebastian's right was not "clearly established" at the time the shooting occurred.

Accordingly, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. Moreover, "the inquiry into whether a right is clearly established

'must be taken in light of the specific context of the case, not as a broad general proposition.'" Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quoting Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011)). Knowledge on behalf of Officer Perez is inferred from relevant case law from the United States Supreme Court, the Eleventh Circuit, and the Supreme Court of Florida. Id. The Eleventh Circuit also emphasized "that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Id. (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)). In addition, a plaintiff can show a right is clearly established by pointing "to a 'broader, clearly establish principle [that] should control the novel facts in his situation,'" Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)(internal quotation omitted), or by showing "that an official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.'" Morton v. Kirkwood, 707 F.3d 1276, 1292 (11th Cir. 2013)(quoting Priester, 208 F.3d at 926).

On this issue, Plaintiffs rely on a number of cases that are factually distinguishable inasmuch as they all concern fleeing suspects. See, e.g., Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir. 1985)(suspect eluded police twice and tried to escape a third time prior to shooting); Acoff v. Abston, 762 F.2d 1543 (11th

Cir. 1985)(burglary suspect shot in the chest while fleeing); Pruitt v. City of Montgomery, 771 F.2d 1475 (11th Cir. 1985)(burglary suspect shot after refusing police commands to stop); Carr, 338 F.3d 1259; Vaughn v. Cox, 343 F.3d 1323 (11th Cir. 2003)(fleeing suspect shot after throwing rocks toward police officer's surveillance location).

Plaintiffs also rely on three cases involving non-fleeing suspects and assert that these decisions present similar factual contexts to the present case since Sebastian was not fleeing at the time of the shooting. In Lundgren v. McDaniel, 814 F.2d 600, 602 (11th Cir. 1987), police entered a video store in response to a suspected burglary. Unknown to the officers, the store owner was asleep in the store behind a desk. When the owner attempted to rise from behind the desk, police officers fired on the store owner without provocation and killed him. In the second case, McKinney ex rel. McKinney v. DeKalb Cnty., Ga., 997 F.2d 1440, 1443 (11th Cir. 1993), police officers responded to a 911 call from a mother stating that her teenage son had locked himself in a room with a knife. Upon arrival, police officers found the son sitting on the floor of a closet armed with a knife. The son did not respond to the officers' attempts to communicate with him. Then, as the son put the knife down and began to rise from the floor, an officer fired five shots paralyzing him. Lastly, in Morton v. Kirkwood, 707 F.3d 1276 (11th Cir. 2013), after attempting to evade police

pursuit at a very low speed and coming to a complete stop, police officers "shot Morton, hitting him with seven bullets, while he sat stationary in his car with his hands up." Morton, 707 F.3d at 1287.

Of the cases mentioned above, the underlying facts of McKinney are closest to the circumstances of the case at bar — i.e., an armed non-fleeing suspect. Although, the McKinney court did not make an express finding concerning excessive force, it did infer that "[t]he law was clearly established before Nelsen's actions in March 1990 that police use of excessive force is a constitutional violation" in the context of an armed non-fleeing suspect not posing an immediate threat to officers. Id. (citing Gilmere, 774 F.2d at 1500-02). In addition, the court's decision in McKinney focused on the factual dispute "as to what happened that led [defendant] to fire his gun." McKinney, 997 F.2d at 1443. The court ultimately concluded that "[a]s alleged by plaintiffs, . . ., [plaintiff] had previously put down his knife and was merely shifting position, not threatening the safety of any persons, when Officer Nelsen shot him. Under these facts, Officer Nelsen is not entitled to summary judgment on the ground of qualified immunity." Id.

Here, the Court comes to a similar conclusion and finds that the law was clearly established prior to May 2012, insofar as it is a constitutional violation to use deadly force on an armed non-fleeing suspect not posing an immediate threat to the lives of

31

police officers or others. <u>McKinney</u>, 997 F.2d at 1443; <u>cf.</u> <u>Penley</u> <u>v. Eslinger</u>, 605 F.3d 843 (11th Cir. 2010)(holding that police officer who fatally shot a 15-year old student, while cornered in a bathroom, armed with what later turned out to be a toy firearm, and initially taking another student hostage, acted in an objectively reasonable manner). If the Court accepts Plaintiffs' version of events, Sebastian did not pose an immediate threat to Officer Perez's life. As such, a reasonable officer would not have thought it was lawful to fire nine shots at an armed, yet compliant, non-fleeing suspect who was not posing an immediate threat to the officer's life. <u>Saucier</u>, 533 U.S. at 202. Indeed, if accepted, Plaintiffs' version of events could lead to the conclusion that Officer Perez's conduct was so egregious that it extended "far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution even without caselaw on point.'" <u>Morton</u>, 707 F.3d at 1292. Therefore, given the genuine issue of material fact concerning Sebastian's hand placement at the time of the shooting, Officer Perez is not entitled to qualified immunity and summary judgment is not appropriate as to Count II.

### D. Count IV

As to Plaintiffs' claim of common law battery, Officer Perez maintains that he is entitled to judgment as a matter of law because he enjoys both sovereign and self-defense immunity.

Plaintiffs disagree with Officer Perez's assertion and argue that the existence of genuine issues of fact preclude Officer Perez's exercise of immunity.

Accordingly, under Florida law, a "simple battery 'occurs when a person: [1] Actually and intentionally touches or strikes another person against the will of the other; or [2] Intentionally causes bodily harm to another person." U.S. v. Diaz-Calderone, 716 F.3d 1345, 1347 (11th Cir. 2013)(quoting Fla. Stat. § 784.03(1)(a)). However, "[a] person who uses or threatens to use force as permitted in § 776.012[4] . . . is justified in such conduct and is immune from criminal prosecution and civil action for the use or threatened use of such force." Fla. Stat. § 776.032. In addition, "[n]o officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort . . . unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).

As stated above, a genuine issue of material fact exists as to the placement of Sebastian's hands at the moment of the shooting. If a jury decides the question in Sebastian's favor, then Officer

---

[4] Fla. Stat. § 776.012(2) - "A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony."

Perez would not be entitled to self-defense or sovereign immunity because the belief that his life was in peril, which ultimately caused him to fire nine (9) shots at Sebastian's back, would not have been reasonable. Furthermore, if the jury accepts Sebastian's version of events, Officer Perez's conduct would have exhibited a wanton and willful disregard of Sebastian's rights and safety since he neither posed an immediate threat nor offered any resistance to Officer Perez's commands. See Lamay v. Kondrk, 860 So. 2d 1022, 1025 (Fla. 5th DCA 2003)(Orfinger, J., dissenting)("For conduct to be willful and wanton, it must be shown that the defendant knew, or reasonably should have known in light of the surrounding circumstances, that his conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences."); see also Keating v. City of Miami, 598 F. Supp. 2d 1315, 1343 (S.D. Fla. 2009).

On the other hand, if the jury accepts Officer Perez's version of events, self-defense and sovereign immunity would operate to shield him from liability. Thus, given the genuine issue of material fact concerning Sebastian's hand placement at the time of the shooting, Officer Perez is not entitled to self-defense or sovereign immunity in the current posture of the case and summary judgment is not appropriate as to Count IV.

**E. Count V**

Similar to his argument against Plaintiffs' common law battery claim, Officer Perez asserts that he is entitled to summary judgment on Plaintiffs' claim for intentional infliction of emotional distress on the basis of sovereign and self-defense immunity. Likewise, Plaintiffs counter Officer Perez's assertion and argue that the existence of genuine issues of fact preclude his exercise of immunity.

In order to prevail on a claim of intentional infliction of emotional distress, Plaintiffs must show and ultimately prove "(1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) proof that the conduct caused the severe emotional distress." Triana v. Diaz, 2014 WL 5319800, at *7 (S.D. Fla. Oct. 16, 2014)(quoting R.W. v. Armor Corr. Health Servs., Inc., 830 F. Supp. 2d 1295, 1304 (M.D. Fla. 2011)). Additionally, whether the "conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law, not a question of fact." Spadaro v. City of Miramar, 2012 WL 668044, at *11 (S.D. Fla. Feb. 29, 2012)(citing Liberty Mut. Ins. Co. v. Steadman, 968 So. 2d 592, 595 (Fla. 2d DCA 2007)). Regarding the severity of the emotional distress, "'[t]he law only intervenes only where the distress inflicted is so severe that no reasonable man could be expected to

endure it.'" <u>Baker v. Lightsey</u>, 2012 WL 1574649, at *5 (S.D. Fla. May 3, 2012)(quoting <u>Frias v. Demings</u>, 2011 WL 4903086, at *12 (M.D. Fla. Oct. 14, 2011)). Courts uphold claims of intentional emotional distress only in "extremely rare circumstances." <u>Metro. Life. Ins. Co. v. McCarson</u>, 467 So. 2d 277, 278 (Fla. 1985).

Since the factual dispute over Sebastian's hand placement at the time of the shooting precludes Officer Perez's self-defense and sovereign immunity defenses, viewing the record most favorably to Plaintiffs, the Court will assume the existence of extreme and outrageous conduct as well as a reckless disregard to the probability of causing emotional distress. As to the existence of severe emotional distress, during his deposition, Sebastian explains his diagnosed and undiagnosed physical injuries; however, he does not include any details concerning emotional injuries. [D.E. 154-2 at 7]. Moreover, Sebastian's statements that he was "in shock" immediately after the shooting and that he "feel[s] very sad" about his criminal history are not sufficient to justify a finding of severe emotional distress or that Officer Perez's actions caused him severe emotional distress. [D.E. 154-2 at 27, 32].

However, pursuant to Rule 56(f), Federal Rules of Civil Procedure, Plaintiffs submitted additional record evidence showing Sebastian's diagnosis and treatment for depression, anxiety, and post-traumatic stress disorder ("PTSD"). [D.E. 195-3 at 26, 195-4

36

at 2]. In addition, Plaintiffs submitted the testimony of one of Sebastian's treating physician's, Dr. Jorge Luis Sotelo. [D.E. 195-5]. Therein, Dr. Sotelo reaffirmed his PTSD diagnosis and further testified that he believed Sebastian's condition is related to the incident in question. Id. at 6. Thus, Plaintiffs provide sufficient evidence that a reasonable jury could find the existence of severe emotional distress as well as related causation. As a result, the Court finds summary judgment is not appropriate as to Count V.

   **F. Count VIII**

   Lastly, Officer Perez again argues that he is entitled to sovereign and self-defense immunity on Plaintiffs' claim of loss of filial consortium. Similarly, Plaintiffs oppose Officer Perez's assertion and argue that the existence of genuine issues of fact preclude his exercise of immunity and summary judgment.

   Pursuant to Fla. Stat. § 768.0415:

   A person who, through negligence, causes significant
   permanent injury to the natural or adoptive parent of an
   unmarried dependent resulting in permanent total
   disability shall be liable to the dependent for damages,
   including damages for the permanent loss of services,
   comfort, companionship, and society. This section shall
   apply to acts of negligence occurring on or after October
   1, 1988.

Moreover, in U.S. v. Dempsey, 635 So. 2d 961, 965 (Fla. 1994), the Florida Supreme Court extended this cause of action and held that "a parent of a negligently injured child has a right to recover for the permanent loss of filial consortium suffered as a result of a significant injury resulting in the child's permanent total

disability." The Dempsey court went on to define "loss of consortium" as "loss of companionship, society, love, affection, and solace of the injured child, as well as ordinary day-to-day services that the child would have rendered." Id. Furthermore, "in order for a parent to recover a separate award for the loss of a permanently disabled child's services above that recoverable as a general component of loss of filial consortium, the parent must establish that the child had extraordinary income-producing abilities prior to the injury. Id. (citing Gresham v. Courson, 177 So. 2d 33 (Fla. 1st DCA 1965)).

Assuming, for the purposes of summary judgment, Officer Perez is not entitled to immunity on this claim, there simply is no record evidence to support a finding that Sebastian was negligently injured as required by Fla. Stat. § 768.0415. In an effort to survive summary disposition of this claim, Plaintiffs rely on Honeywell Int'l., Inc. v. Guilder, 23 So. 3d 867, 870 (Fla. 3d DCA 2009) and its interpretation of unambiguous statutory terms. [D.E. 195 at 6]. Therein, the Honeywell court held, within the meaning of Fla. Stat. § 768.0415, "the term 'negligent act' is defined as 'an act that creates an unreasonable risk of harm to another.'" Honeywell Int'l., Inc., 23 So. 3d at 870. The court further stated that, based upon its "review of the statute's legislative history, we find that the Legislature specifically limited section 768.0415 to negligent acts occurring on or after October 1, 1988." Id. In

38

turn, Plaintiffs maintain Officer Perez's actions in this case created such an unreasonable risk of harm to Sebastian. [D.E. 195 at 6].

Although <u>Honeywell</u> accurately defines a negligent act as defined in Fla. Stat. § 768.0415, the undisputed facts of this case as well as Plaintiffs' overall theory of liability do not sound in negligence. Interestingly enough, Plaintiffs emphasize this precise point in their opposing memorandum of law by arguing that "this case presents facts evidencing *a purposeful exercise of decision-making* by [Officer Perez] that led directly to the unreasonable, unconstitutional, but avoidable shooting of [Sebastian]." [D.E. 160 at 1] (emphasis added). In addition, Officer Perez testified during his deposition that, in response to being in fear for his life, he intentionally discharged his firearm. [D.E. 154-1 at 94]. At no point during his deposition did Officer Perez testify to accidentally or inadvertently discharging his weapon. Indeed, it is difficult to envision the circumstances under which one could negligently discharge a firearm nine (9) times towards someone's back.

Further, beyond the allegations in their Third Amended Complaint, Andres Gregory and Amalia Villafane-Gregory have not come forward with any evidence detailing how they "have been deprived of the value of Sebastian's ordinary day-to-day services as well as the loss of companionship, society, love, affection, and

solace" or how they "will continue to be so deprived in the future." [D.E. 60 at 13, ¶ 63]. As stated above, summary judgment is appropriate when there is "an absence of evidence to support the non-moving party's case." Celotex Corp., 477 U.S. at 323-24. Therefore, the Court finds Officer Perez is entitled to summary judgment on Count VIII.

**IV. CONCLUSION**

Based on the aforementioned, it is hereby

**ORDERED AND ADJUDGED** that Officer Perez's Motion for Summary Judgment and Incorporated Memorandum of Law [D.E. 153] is **GRANTED IN PART** and **DENIED IN PART**. Officer Perez's Motion is **GRANTED** as to Counts I, VI, and VIII and **DENIED** as to Counts II, IV, and V.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 20th day of August, 2015.

DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record